# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY
DOC #: _____
DATE FILED: 3-31-15

No. 14-cv-1687 (RJS)

JOHN LIU, *et al.*,

Plaintiffs,

VERSUS

THE NEW YORK CITY CAMPAIGN FINANCE BOARD, *et al.*,

Defendants.

OPINION AND ORDER
March 31, 2015

RICHARD J. SULLIVAN, District Judge:

Plaintiffs John Liu, the former Comptroller of the City of New York who unsuccessfully ran for mayor in 2013, and his political fundraising committee, "Friends of John Liu," bring this action against Defendants The New York City Campaign Finance Board (the "CFB" or the "Board") and The City of New York, alleging two distinct constitutional violations pursuant to 42 U.S.C. § 1983. First, Plaintiffs allege that the CFB violated their First Amendment rights when it denied them public matching funds and seek damages and a declaration that a CFB rule governing the distribution of campaign matching funds violates the First Amendment. Second, Plaintiffs seek damages on the grounds that the CFB treated Plaintiffs differently than similarly situated candidates, in violation of the Equal Protection Clause of the Fourteenth Amendment. Now before the Court is Defendants' motion to dismiss Plaintiffs' Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 27.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

Because Plaintiffs' allegations concern Defendants' role in administering various statutes and regulations relating to the financing of political campaigns in New York City, the Court will begin with an overview of that statutory and regulatory framework before turning to the specific

allegations contained in Plaintiffs' Complaint.[1]

### A. Relevant Statutes and Regulations

In 1988, the New York City Council enacted the Campaign Finance Act (the "Act" or the "CFA"), which established a program of optional, public "matching" funds to participating candidates for Mayor, Comptroller, Public Advocate, Borough President, or City Council. N.Y.C. Admin. Code § 3-701, *et seq.* The CFA's matching funds program (the "Program") is administered by the CFB, an independent, nonpartisan five-person city agency with rule making authority. *Id.* § 3-708(1), (7); N.Y.C. Charter § 1051-52; *see id.* § 1057 (noting that the CFB is obligated to "conduct all . . . activities in a strictly non-partisan manner"). CFB Rule 1-02 notes that a "participant" in the Program "includes the candidate, the principal committee authorized by the candidate . . . , *the treasurer of such committee*, and any other agent of the candidate." CFB R. 1-02 (emphasis added).

The CFA imposes certain obligations – not at issue here – on all candidates regardless of Program participation, including requiring participants to report contributions and expenditures, limit donations from any single contributor, and respond to the Board's requests to ensure Program compliance. N.Y.C. Admin. Code

§ 3-703(6), (1)(f), (1)(d). The CFA imposes additional requirements – also not at issue here – on participants seeking to participate in the Program, including, *inter alia*, the presence of an opposing candidate, proof of a threshold level of support, submission of a written certification by June 10 that the candidate will comply with all applicable laws and Board rules, and the maintenance of records sufficient to verify compliance with the Act. *Id.* § 3-703(1), (2); (*see also* Compl. ¶¶ 33–35). Before a candidate can receive public matching funds, the Board must determine that the candidate has "met all eligibility requirements of the Act and [CFB enforcement rules]." CFB R. 5-01(a)(1).

In addition to the above criteria, the Rule at issue in the case at bar, CFB Rule 5-01(f), provides a non-exhaustive list of ten factors upon which the Board can find a candidate ineligible for public matching funds. In the Rule's introduction there is a catch-all phrase: "The Board shall determine whether public funds shall not be paid to a participant for reasons that include, but are not limited to . . . ." CFB R. 5-01(f). The ten non-exhaustive reasons include:

> (1) if there is reason to believe that the participant has committed a violation of the Act or these Rules . . . [and] (7) if the participant or an agent of the participant has been found by the Board to have committed fraud in the course of Program participation or to be in breach of certification pursuant to Rule 2-02 . . . .

CFB R. 5-01(f)(1), (7); (*see also* Compl. ¶¶ 39–41). Rule 2-02, referenced in Rule 5-01(f)(7), provides an additional non-exhaustive list, which details "fundamental breaches" of the required written certification for candidates seeking public

---

[1] The facts are taken from Plaintiffs' Complaint, filed on March 12, 2014 (Doc. No. 2 ("Compl.")). In ruling on Defendants' motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 29 ("Mem.")), Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss (Doc. No. 31 ("Opp'n")) and the accompanying declaration of David A. Lebowitz (Doc. No. 32), and Defendants' reply memorandum of law in support of their motion to dismiss (Doc. No. 34 ("Reply")).

matching funds.  CFB R. 2-02; (*see* Compl. ¶ 38).  The two relevant "fundamental breaches" that are enumerated in Rule 2-02 are:

> (a) submission of a [CFB report] which the participant knew or should have known includes substantial fraudulent matchable contribution claims; . . . [and] (e) submission of substantial information which the participant . . . knew or should have known was false, or the submission of substantial documentation which the participant or limited participant knew or should have known was fabricated or falsified, which would avoid a finding of violation . . . .

CFB R. 2-02(a), (e).  The last sentence of Rule 2-02 is a second catch-all provision that notes, "[t]his rule is not intended to be an enumeration of all circumstances that may constitute a fundamental breach of obligations, as may be determined by the Board." CFB R. 2-02.  Finally, of the ten bases upon which the Board may find a candidate ineligible for public matching funds pursuant to CFB Rule 5-01(f), some, but not all, of these violations may be cured. For example, a violation of CFB Rule 5-01(f)(4) – failure to submit a required disclosure statement – is curable, but a violation of CFB Rule 5-01(f)(6) – receipt of the maximum amount of public funds permitted by the Act – is not.

### B. The CFB and the Liu Campaign

On October 11, 2011, in the run up to the New York City mayoral election, *The New York Times* published an article noting "irregularities" in the fundraising efforts of Liu's campaign.  (*See* Compl. ¶¶ 98–100.) Four and a half months later, a federal grand jury indicted Jia "Jenny" Hou, Liu's campaign treasurer, and a Liu fundraiser,

Xing Wu "Oliver" Pan, on charges of conspiracy to commit wire and mail fraud, substantive acts of wire fraud, and obstruction of justice in connection with the irregularities.  (*See id.* ¶¶ 103, 105.) Specifically, the government alleged that Hou worked with a "fundraising intermediary" – Pan – in an illegal fundraising scheme. (*See id.* ¶ 105.)  On May 2, 2013, Hou was convicted of obstruction of justice, making false statements, and attempted wire fraud (*see id.* ¶ 122), and Pan was convicted of conspiracy to commit wire fraud and attempted wire fraud.  *United States v. Xing Wu Pan*, No. 12-cr-153 (RJS) (S.D.N.Y. Oct. 11, 2013) (Doc. Nos. 184–185).

On May 20, 2013, Liu's campaign received a letter from the CFB's Director of Campaign Finance Administration stating that the CFB staff would be recommending that the campaign not be allowed access to public funding.  (*See* Compl. ¶¶ 125–129.) The Director referenced "information obtained in connection with" Hou and Pan's trial and the Board's own ongoing investigation, and cited CFB Rules 2-02, 5-01(a)(1), (f)(1), and (f)(7), the rules set forth above.  (*See id.* ¶¶ 126, 129.)  The letter noted that the evidence at trial "call[ed] into question the legitimacy of all contributions received by" Liu's campaign.  (*Id.* ¶ 128.) On July 19, 2013, the same CFB Director notified the Liu campaign in a letter, attaching hundreds of pages of records documenting the CFB's findings, that the CFB had invalidated 1,751 of the campaign's matchable contribution claims. (*Id.* ¶¶ 131, 133.)  Plaintiffs first learned about the invalidated reports, which the campaign filed from December 2010 to July 2013, from this letter and attachments.  (*See id.* ¶ 133.)  The Director later said the CFB staff members were troubled that the campaign continued to employ three individuals whom the staff believed were

"connected to improper fundraising efforts." (*Id.* ¶¶ 139, 141.) Moreover, the Director noted that the CFB had retained a private investigation firm, Thacher Associates, to investigate Liu's campaign. (*Id.* ¶ 142.) After interviewing 22 contributors to the Liu campaign and 19 "family members" of Liu contributors, Thacher Associates "found evidence of potential campaign finance law violations, including reimbursed contributions and falsified documents." (*Id.* ¶¶ 145–147.)

On August 5, 2013, the CFB rejected the Liu campaign's request for $3.8 million in matching funds and voted to deny public funding to the campaign. (*See* Compl. ¶¶ 169–171, 202.) After the meeting, Reverend Joseph Parkes, then-chair of the CFB, said that "there is reason to believe that violations of the [CFA] and [CFB rules] have been committed" by Liu's campaign and that the campaign placed "in a major role at least one person who admitted to a plan to violate campaign finance law." (*Id.* ¶¶ 172–173.) Parkes added that the CFB's "choice" to deny public funding was based on the campaign's lack of "a complete and accurate set of records that demonstrates compliance." (*Id.* ¶¶ 174–175.) On September 10, 2013, Liu lost the Democratic Party primary, receiving seven percent of the vote. (*See id.* ¶ 8.) Currently, the Liu campaign has outstanding debts, which it cannot afford to pay. (*See id.* ¶ 184.) The CFB is conducting a final audit of the campaign. (*See id.* ¶ 181.)

In addition to the facts described above, Plaintiffs describe the CFB's handling of six other campaigns, all of which sought public matching funds during their respective elections. (*See* Compl. ¶¶ 58–93.) The Court will later summarize the alleged facts relating to each of these six campaigns when it considers Plaintiffs' Fourteenth Amendment claim.

## C. Procedural History

On March 12, 2014, Plaintiffs filed their Complaint in the instant action, alleging First and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983. (*See* Compl.) With respect to the First Amendment claim, Plaintiffs primarily seek a declaration that CFB Rule 5-01(f) is *facially* unconstitutional, as well as an injunction that prevents the CFB from enforcing Rule 5-01(f) in the future, on the grounds that the Rule "gives a government agency substantial power to discriminate against disfavored speakers by suppressing their expression." (Compl. ¶ 207; *see id.* ¶¶ 195–208.) Plaintiffs also advance an "as-applied" First Amendment challenge seeking damages, although their briefing barely addresses this argument except to note that the facial challenge is their "central claim." (Opp'n at 1). Specifically, Plaintiffs allege in their Complaint that "[t]he denial of all matching funds to Plaintiffs constituted an unconstitutional prior restraint that improperly stifled Plaintiffs' First Amendment right to expression," and that the Board's "arbitrary decision caused Plaintiffs to lose $3.8 million in matching funds and prevented Plaintiffs from waging a viable campaign for Mayor." (*Id.* ¶ 202.)

With respect to the Fourteenth Amendment cause of action, Plaintiffs bring an "as-applied," "class of one" equal protection claim. Specifically, Plaintiffs allege that the CFB "intentionally treated Plaintiffs differently than [six] similarly situated candidates and campaigns who have been alleged or found to have violated the Campaign Finance Act." (*Id.* ¶ 210). Plaintiffs assert that "[t]his different treatment was intentional, wholly arbitrary,

and without rational basis" (*id.* ¶ 214), and seek damages and attorneys' fees.[2]

On May 15, 2014, Defendants filed their motion to dismiss, which was fully submitted by July 2, 2014.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable

inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

## III. PLAINTIFFS' FIRST AMENDMENT CLAIMS

The Supreme Court has instructed courts facing simultaneous "as-applied" and facial challenges to first resolve the "as-applied" challenge before addressing the facial challenge in order to avoid "proceed[ing] to an overbreadth [facial] issue unnecessarily." *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 484–85 (1989). As explained by the Supreme Court, this is partially a function of efficiency given that the facial analysis is more taxing "since it requires determination whether the statute's overreach is *substantial*, not only as an absolute matter, but 'judged in relation to the statute's plainly legitimate sweep,' and therefore requires consideration of many more applications than those immediately before the court." *Id.* (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). The Court heeds this advice and addresses first Plaintiff's "as-applied" claim.

### A. "As-applied" Challenge to the CFB's Denial of Matching Funds to the Liu Campaign

In their Complaint, Plaintiffs assert an "as-applied" First Amendment challenge seeking damages. Specifically, Plaintiffs allege that "[t]he denial of all matching funds to Plaintiffs constituted an unconstitutional prior restraint that improperly stifled Plaintiffs' First

---

[2] Plaintiffs also filed suit against Defendant Rose Gill Hearn, who was chair of the CFB at the time of the Complaint's filing. In the Complaint, Plaintiffs asked the Court to enjoin Hearn from exercising her "enforcement powers" over them as the CFB audited Liu's campaign. (*See* Compl. ¶¶ 217–221.) Plaintiffs alleged that Hearn was improperly appointed as a member of the CFB. (*See id.* ¶ 218.) Shortly after Defendants filed their motion to dismiss, Hearn and Plaintiffs reached an agreement to dismiss with prejudice the claim against Hearn and to remove her as a party to the instant action. (*See* Doc. No. 30.) On May 20, 2014, the Court entered a Stipulation and Order memorializing the agreement. (*See id.*) Accordingly, the Clerk of Court is directed to correct the caption and terminate Hearn as a party.

Amendment right to expression," and that the Board's "arbitrary decision caused Plaintiffs to lose $3.8 million in matching funds and prevented Plaintiffs from waging a viable campaign for Mayor." (*Id.* ¶ 202; *see id.* ¶¶ 103–180.) Plaintiffs nonetheless appear to seek damages exceeding this $3.8 million figure, as they allege that "Liu suffered extreme mental and emotional anguish, along with dignity harms, resulting from being unfairly and unwarrantedly accused of wrongdoing," and that "[t]he damage to [Liu's] reputation and earning potential, caused by the Board's arbitrary, unfair and erroneous decision to withhold funds from his 2013 campaign makes any future political activity far more difficult." (*Id.* ¶ 183.)

### 1. Applicable Standard

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." U.S. Const. amend. I. The First Amendment applies to state governments through the Due Process Clause of the Fourteenth Amendment. *See Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007). Since it is "well settled that municipal ordinances adopted under state authority constitute state action," such ordinances are within the First Amendment's prohibition. *See Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938). Thus, Section 1983 of Title 42 of the United States Code affords Plaintiffs a cause of action against Defendants if, as Plaintiffs allege, Defendants have deprived them of such a constitutional right. 42 U.S.C. § 1983.

The Supreme Court has long distinguished restrictions on speech from denials of government subsidies. "[A]lthough the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech . . . at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998); *see also Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 256 n.9 (1986) ("[T]here is no right to have speech subsidized by the Government.").

In *Buckley v. Valeo*, the Supreme Court found that a federal campaign financing law that provided no public funding to some candidates was constitutional because it was a "congressional effort, not to abridge, restrict or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." 424 U.S. 1, 92–93 (1976). The *Buckley* Court rejected the First Amendment challenge to a public financing system, ruling that the system "furthers, not abridges, pertinent First Amendment values." *Id.* at 93; *see also Davis v. Federal Election Comm'n*, 554 U.S. 724, 739–40 (2008) (noting that the public funding system in *Buckley* preserved the candidate's "unfettered right to make unlimited personal expenditures").

With respect to elections, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . ."). Given the necessity of regulating elections, several courts have rejected First Amendment challenges to different provisions of the CFA that – like the Rules Plaintiffs

6

challenge here – permitted the CFB to withhold matching funds. *See Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05-cv-7040 (GBD) (MHD), 2007 WL 2844939, at *15 (S.D.N.Y. Sept. 28, 2007) ("Because the CFB deadline is only minimally burdensome, it is justified if it is a 'reasonable, non-discriminatory restriction[]' that serves 'important regulatory interests.' It plainly meets this test. . . . [T]he overarching goal of regulating campaign contributions to promote fairness and prevent corruption in elections is an important government interest." (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)); *Ostrom v. O'Hare*, 160 F. Supp. 2d 486, 495 (E.D.N.Y. 2001) (approving "one of the primary purposes of the deadline – to allow for a proper audit of the candidate's funds"); *Rogers v. N.Y.C. Bd. of Elections*, 988 F. Supp. 409, 413 (S.D.N.Y. 1997) (finding that "[t]he program's April 30 application deadline imposes an extremely minor burden on the right to vote" and that the application deadline is a "'reasonable, nondiscriminatory restriction[]' that serves 'important regulatory interests'" (quoting *Burdick*, 504 U.S. at 434)).

In 2011, the Second Circuit, noting the government's strong interest in regulating elections, rejected First and Fourteenth Amendment challenges to provisions of the New York City Administrative Code concerning, *inter alia*, campaign contribution limits. *See Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011). *Ognibene* addressed the matching funds provisions of the public financing scheme, and is especially instructive in resolving the case at bar. The Second Circuit, in upholding the constitutionality of rules "deny[ing] matching funds for contributions by people who have business dealings with the City," explained that "[n]on-matching does not prevent someone from making a

contribution," and found that the non-matching provision "is closely drawn to address a sufficiently important governmental interest." *Id.* at 178, 193. In *Ognibene*, the Second Circuit also made clear that the CFB's matching funds program is an *amplification* of speech, which is subject to a "less stringent standard of review" than a *prohibition* of speech. *Id.* at 193. Specifically, the Second Circuit explained:

> When participation is voluntary and public money is used, stricter restrictions may be imposed, perhaps even restrictions that would normally be impermissible. Candidates who choose not to participate, and their contributors, *are not prevented from freely expressing their political speech* and associations; the legislature has merely decided not to amplify their contributions with tax dollars. That decision is entirely permissible. *Buckley* held that Congress "may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."

*Id.* (emphasis added) (quoting *Buckley*, 424 U.S. at 57 n.65; citing *Davis*, 554 U.S. at 739–40; *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2828 (2011)). Accordingly, the CFB's discretion to deny matching funds to candidates such as Plaintiffs is similarly subject to a "less stringent standard of review" than would a prohibition of speech. *Id.*

When considering "[c]onstitutional challenges to specific provisions of a State's election laws," courts "cannot . . . resolve[] [them] by any litmus-paper test that will separate valid from invalid restrictions."

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (citation and internal quotation marks omitted). Rather, as a first step, courts must "consider the character and magnitude of the asserted injury to the rights protected by the First . . . Amendment[] that the plaintiff seeks to vindicate." *Id.* As the second step, courts then are required to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id. Anderson* further instructs that "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* at 788. For the third and final step, courts must decide whether the agency's actions were "closely drawn to address a sufficiently important state interest." *Ognibene*, 671 F.3d at 183. As the Second Circuit observed in *Ognibene*, because the CFB's public matching funds program is an amplification of speech rather than a prohibition, "stricter restrictions may be imposed, perhaps even restrictions that would normally be impermissible." 671 F.3d at 193

## 2. Discussion

As an initial matter, the Court notes that Plaintiffs all but abandoned their "as-applied" challenge in their brief. Plaintiffs appear to deny the existence of this "as-applied" argument when they state that they "vehemently dispute the Board's purported factual bases for denying matching funds to the Liu campaign," yet contend in the next sentence that "[f]or purposes of the First Amendment question before the court, however, ***that dispute is irrelevant***." (Opp'n at 10 (bold and italics in original).) Plaintiffs further undermine any "as-applied" First Amendment challenge by referring to their facial challenge as their "central claim," stating that "at its heart, this case is not specific to the Liu campaign at all," and declaring that "[t]his case is not

about whether the CFB acted 'reasonably' when it denied Plaintiffs, John Liu and Friends of John Liu, public matching funds." (Opp'n at 1.) Of course, as noted in *Anderson*, whether the CFB acted reasonably when it denied Plaintiffs matching funds is what Plaintiffs' "as-applied" First Amendment challenge is about, notwithstanding Plaintiffs' statement to the contrary. *See Anderson*, 460 U.S. at 788 (noting that "the state's important regulatory interests are generally sufficient to justify *reasonable*, nondiscriminatory restrictions" (emphasis added)); *Piccolo*, 2007 WL 2844939, at *15 (applying this standard to uphold an "as-applied" challenge to a CFA provision enforced by the CFB); *Ostrom*, 160 F. Supp. 2d at 494–95 (same); *Rogers*, 988 F. Supp. at 413 (same).

Thus, pursuant to *Anderson* and *Ognibene*, the Court will, first, determine the burden imposed by the CFB's action on Plaintiffs' First Amendment rights, and second, evaluate the magnitude of the CFB's regulatory interests. Third, the Court will decide whether the CFB's actions were "closely drawn to address a sufficiently important state interest." *Ognibene*, 671 F.3d at 183.

As the first step of this analysis, the Court finds that Plaintiffs' First Amendment rights were not substantially burdened. First, as the Second Circuit has noted, candidates not receiving matching funds "are not prevented from freely expressing their political speech." *Ognibene*, 671 F.3d at 193. That is, the CFB's actions did not limit Liu's access to the ballot or to voters; rather, the Board "merely decided not to amplify [Plaintiffs'] contributions with tax dollars." *Id.*; *see Buckley*, 424 U.S. at 94 ("[T]he denial of public financing to some . . . candidates is not restrictive of voters' rights and less restrictive of candidates' [than limits on ballot access]").

Second, Plaintiffs do not allege that they refrained from speech on account of the Board's ruling. Third, the CFB did not award additional matching funds to other candidates by virtue of its denying funds to Liu's campaign. Fourth, and finally, Plaintiffs do not suggest that the CFB considered the content of the Liu campaign's message in making its decision, and they point to no evidence that the CFB relied on anything other than reasonable, content-neutral grounds in reaching its decision.

With respect to the second step of the inquiry, Plaintiffs do not challenge the importance of the governmental interests at stake here, and even if they did, the Court concludes that Rule 5-01(f) was enacted in furtherance of "a sufficiently important governmental interest." The three interests advanced by Defendants here – (1) "enforcing compliance with the CFA and the CFB's rules"; (2) "preserving the public fisc from fraud"; and (3) "ensuring that the CFB is not perceived by the public as tolerating or otherwise countenancing corruption" (Reply at 2–3) – are essentially the same interests courts have invoked to uphold electoral regulations for decades, including "as-applied" challenges to the CFB, and certainly justify the CFB's power to withhold public funding under Rule 5-01(f). *See, e.g.*, *Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 433; *Storer*, 415 U.S. at 730; *Ognibene*, 671 F.3d at 193; *Piccolo*, 2007 WL 2844939, at *15; *Ostrom*, 160 F. Supp. 2d at 494–95; *Rogers*, 988 F. Supp. at 413.

As the third step of the "as-applied" analysis, the CFB's application of its rules to the Liu campaign was "closely drawn to address" the important government interests at stake. No one contests that Hou, the Liu campaign treasurer, was convicted of obstruction of justice, making false

statements, and attempted wire fraud (*see id.* ¶ 122), or that Pan – a Liu fundraiser – was convicted of conspiracy to commit wire fraud and attempted wire fraud, or that these convictions related to their campaign duties. *United States v. Xing Wu Pan*, No. 12-cr-153 (RJS) (S.D.N.Y. Oct. 11, 2013) (Doc. Nos. 184–185). As noted above, CFB Rule 1-02 unambiguously defines a "participant" in the matching funds program to include "the candidate, the principal committee authorized by the candidate . . ., *the treasurer of such committee*, and any other agent of the candidate." CFB R. 1-02 (emphasis added). Indeed, Plaintiffs do not and cannot dispute in their Complaint that Hou and Pan violated the CFB's Rules.

As relied upon by. Rev. Parkes and referenced in Plaintiffs' Complaint, there was testimony at trial that Hou offered to reimburse an ex-boyfriend for a potential campaign contribution and that she coached campaign workers how to avoid CFB scrutiny.[3] (*See* Compl. ¶ 114–115; *United States v. Xing Wu Pan*, No. 12-cr-153 (RJS), Doc. No. 148, Trial Transcript, Apr. 25, 2013, 1150:12–16 (internal campaign message from Hou noting that "CFB auditors look very carefully at the handwriting. . . . [s]o if you're [signing in place of donors], just make sure the handwriting looks as close to the donors' as possible. . . . If too difficult, don't take risk.").) There also was trial testimony that some donors were donors in name only, with the contributions paid by their employers or

---

[3] Because the evidence from Hou and Pan's trial was specifically referenced and relied upon in the Complaint, and because the Court may take judicial notice of documents filed in other proceedings to establish not the truth of what was stated, but merely the *fact* of what was said, the Court may consider the transcripts from Hou and Pan's criminal trial. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

other intermediaries in violation of CFB rules. (*See* Compl. ¶ 112; *United States v. Xing Wu Pan*, No. 12-cr-153 (RJS), Doc. No. 140, Trial Transcript, Apr. 18, 2013, 278:19–20 (quoting Pan as saying "[Liu] has 20 people donating 800, but it's all from Richard"); *id.* 278:1–22, 279:13–16; *id.* Doc. No. 142, Trial Transcript, Apr. 22, 2013, 324:9–14, 324:19–23.) Furthermore, the obstruction of justice and false statement convictions concerned Hou's failure to identify campaign intermediaries as required by law, as well as other attempts to mislead the CFB. (Compl. ¶ 104.) The CFB's response – enforcing its own Rules to combat such corruption – plainly was "closely drawn" to address the important government interests at stake, namely, rooting out dishonesty from elections, preserving public confidence, protecting the public fisc from fraud, and enforcing compliance with Board rules.

Put simply, given the prosecution and conviction of Hou and Pan, the evidence introduced at their trial, and the separate investigation conducted by the Board and its investigator, Thacher Associates, there was ample basis for the Board to believe that Plaintiffs had violated the Act and Board rules. Thus, the Court concludes that any "as-applied" challenge by Plaintiffs is meritless from the face of the Complaint and that the CFB's actions were reasonable, content-neutral decisions that were "closely drawn to address a sufficiently important state interest." *Ognibene*, 671 F.3d at 183. Accordingly, Defendants' motion to dismiss with respect to Plaintiffs' "as-applied" First Amendment challenge is granted.

### B.  Facial Challenge to Rule 5-01(f)

Plaintiffs also raise a First Amendment facial challenge, and, at the outset, the Court notes that "they confront a heavy burden in advancing their claim." *Finley*, 524 U.S. at 580 (citation and internal quotation marks omitted). As the Supreme Court has explained, "[f]acial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort. To prevail, [Plaintiffs] must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *Id.* (citations and internal quotation marks omitted).

### 1.  Standing

Defendants devote a few sentences to the threshold argument that "Plaintiffs lack standing to assert a facial challenge to the CFA and the CFB Rules on First Amendment grounds." (Mem. at 15.) The Court rejects this argument since the Supreme Court has recognized that the traditional standing requirements are relaxed where, as here, "a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity . . . ." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755 (1988). Moreover, Plaintiffs' standing to bring its facial challenge under the First Amendment does not depend upon whether the Board was justified in denying Plaintiffs matching funds, as the Supreme Court "has altered its traditional rules of standing to permit – in the First Amendment area – attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by" a proper statute. *Broadrick*, 413 U.S. at 612 (internal quotation marks omitted); *see also Freedman v. State of Md.*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be

10

proscribed by a properly drawn statute, and whether or not he applied for a license.").

The statutory and regulatory scheme at issue here implicates the First Amendment, since it provides an administrative board with discretion to determine candidates' eligibility for subsidies for speech – that is, public matching funds to political candidates. As another court analyzing the same statutory regime noted, "it cannot be said that the statutes do not implicate First Amendment concerns." *Ostrom*, 160 F. Supp. 2d at 496; *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339–40 (2010) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (citations and internal quotation marks omitted)). In the case at bar, Plaintiffs challenge a statutory regime – N.Y.C. Admin. Code § 3-701, *et seq.* – on the basis that it delegates overly broad licensing discretion to an administrative office, the CFB, to permit or deny expressive activity – the distribution of matching funds to candidates for political office. Accordingly, given the minimal showing needed to satisfy standing requirements for their First Amendment challenge, the Court finds that Plaintiffs have alleged sufficient facts to establish standing.

## 2. Overbreadth Analysis

By their own admission, Plaintiffs "do not demand some abstract 'right to public financing'" (Opp'n at 17), and they concede that "[n]o candidate has an automatic right to public financing for elections." (*Id.* at 2.) Rather, they assert that "once the government *elects* to enact public financing, it must distribute funds neutrally" (*id.* at 17 (emphasis in original)), since a "government agency . . . may not amplify some speakers with public dollars while denying those

funds to other potential speakers under a discretionary standard that lacks defined limits." (*Id.*)

Plaintiffs assert that Rule 5-01(f) is an overbroad, "unbridled" licensing scheme. (Compl. ¶ 199.) Specifically, Plaintiffs argue that Rule 5-01(f) grants the CFB unbridled discretion in three ways. First, Plaintiffs contend that the CFB *may*, but is not *required*, to deny public matching funds to a candidate after it finds that the candidate has violated certain of its rules. (Opp'n at 20.) Second, Plaintiffs argue that Rule 5-01(f)(1)'s language, which permits denials of matching funds "if there is reason to believe that the participant has committed a violation of the Act or these Rules," is "so broad as to be essentially meaningless." (Compl. ¶ 200; Opp'n at 19 n.6.) And, third, Plaintiffs assert that the list of criteria in the CFB regulations is non-exclusive since there are catch-all provisions in Rule 5-01(f)'s introduction and in Rule 5-01(f)(7) that are impermissibly vague. (*Id.* at 17.) The Court will address each of these three grounds in turn.

### a. Permissive Nature of Some Rules

Plaintiffs contend that the broad discretion afforded to the Board – which includes the "ability to waive [an] otherwise applicable Rule in instances it deems insufficiently serious" – is "alone" enough to defeat Defendants' motion. (Opp'n at 20; *see* Compl. ¶¶ 42, 43–45, 52, 57, 64–66, 68–71, 75, 93.)[4]

---

[4] Defendants, for their part, do not dispute that the Board has such discretion; they acknowledge that pursuant to CFB Rule 5-01(f), some but not all violations of the CFA and CFB Rules are curable. (Mem. at 7–8.) For example, violations of CFB Rules 5-01(f)(4) and 5-01(f)(5) – respectively, the failure to submit a required disclosure statement and the failure to provide the Board requested records –

11

However, the fact that a violation of some rules does not automatically result in a denial of matching funds is by no means fatal to the regulation. As the Supreme Court has unanimously ruled, striking a regime on the grounds that it includes *permissive* rather than *mandatory* terms would have drastic consequences: "[o]n [such a] theory, every obscenity law, or every law placing limits upon political expenditures, contains a constitutional flaw, since it merely permits, but does not require, prosecution. . . . On balance, we think the permissive nature of the ordinance furthers, rather than constricts, free speech." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). So too here. Like the plaintiffs in *Thomas*, Plaintiffs are concerned that the permissive grounds for denial of public matching funds vest too much discretion in the CFB, and "that this power of mercy arms the [CFB] to pick and choose among applicants on political grounds." *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000) (Posner, J.), *aff'd*, 534 U.S. 316 (2002). As in *Thomas*, Plaintiffs' "insist[ence] upon a degree of rigidity that is found in few legal arrangements" undermines the very constitutional right they seek to uphold. *Thomas*, 534 U.S. at 325. As Judge Posner noted when analyzing the *Thomas* regulation that was ultimately upheld by the Supreme Court, "if this discretionary feature of the regulation were excised, the regulation would be *more* restrictive than it is," which illustrates "how free speech is so often on both sides of the balance in cases of the *regulation* as distinct from the *prohibition* of speech, a consideration that should make courts

hesitant to invalidate such regulations." *Id.* (emphases added).

Plaintiffs here advance the tenuous position that the Board's discretion runs afoul of the First Amendment (Opp'n at 20), without acknowledging that the alternative – the compulsory denial of funds for *any* violation in *all* circumstances – would likely result in *fewer* funds distributed than under the current regime. As Judge Posner concluded in *Thomas*, "Curtailing speech is an odd way of protecting speech." 227 F.3d at 925. Accordingly, the permissive nature of some of the CFB's rules is far from a fatal constitutional infirmity; if anything, it furthers the rights guaranteed by the First Amendment.

### b. Rule 5-01(f)(1): The "Reason to Believe" Standard

Plaintiffs next argue that Rule 5-01(f)(1) is overbroad because it permits the Board "to deem a candidate ineligible for public financing based merely on 'reason to believe' that his or her campaign has done something wrong." (Compl. ¶ 200.) In particular, Plaintiffs rely on a 1979 Supreme Court case, *Colautti v. Franklin*, which struck down as unconstitutionally vague a statute requiring a physician to conform to a prescribed standard of care "if there is sufficient reason to believe that the fetus may be viable." 439 U.S. 379, 389–97 (1979).

As an initial matter, *Colautti* is inapposite, which perhaps explains Plaintiffs' use of the "*cf.*" signal in the footnote. The statute at issue in *Colautti*

> requires every person who performs or induces an abortion to make a determination, "based on his experience, judgment or professional competence," that the fetus is not

---

are curable, but violations of CFB Rules 5-01(f)(6) and 5-01(f)(9) – respectively, receipt of the maximum amount of public funds permitted by the Act and the candidate's endorsement of his or her opponent – are not curable.

viable.  If such person determines that the fetus is viable, or if "there is sufficient reason to believe that the fetus may be viable," then [s]he must adhere to the prescribed standard of care.

*Id.* at 391.  The *Colautti* Court found that this requirement contained "a double ambiguity," *id.*, neither of which bears on the analysis here of Rule 5-01(f)(1).  First, the ambiguity the Supreme Court described as "more elusive," concerned "[t]he intended distinction between the phrases 'is viable' and 'may be viable. . . .'"  *Id.* at 392.  Needless to say, such vagueness is not at issue here.  Yet even the second ambiguity in *Colautti* is inapplicable here.  As noted in *Colautti*, "it is unclear whether the statute imports a purely subjective standard, or whether it imposes a mixed subjective and objective standard."  *Id.* at 391.  Specifically, the Court noted, with respect to the required standard of care:

> the determination of whether the fetus "is viable" is to be based on the attending physician's "experience, judgment or professional competence," a subjective point of reference.  But it is unclear whether the same phrase applies to the second triggering condition, that is, to "sufficient reason to believe that the fetus may be viable."  In other words, it is ambiguous whether there must be "sufficient reason" from the perspective of the judgment, skill, and training of the attending physician, or "sufficient reason" from the perspective of a cross section of the medical community or a panel of experts.

*Id.*

Thus, unlike the confusion in *Colautti* as to whether the standard of care applicable to the physician was a mixed subjective and objective standard or purely subjective, Rule 5-01(f)(1) here unambiguously imposes an objective standard.

More broadly, the Court rejects Plaintiffs' argument that the "reason to believe" standard is so indefinite as to be meaningless and incapable of providing guidance to decision makers.  (Opp'n at 19 n.6.)  Plaintiffs' argument resembles the plaintiffs' unsuccessful contention in *Thomas* that the phrase "material misrepresentation" is excessively vague.  *See Thomas*, 227 F.3d at 925.  As Judge Posner noted:

> The contention is frivolous.  The word [material] is one of the elemental legal terms, and is considered quite definite enough to form the keystone of criminal prohibitions against fraud. . . . All that their contention regarding the vagueness of 'material misrepresentation' shows is the limits of language and so the inherent limitations of 'facial' challenges.

*Id.*  Similarly here, if Rule 5-01(f)(1) is "essentially meaningless" because of its "reason to believe" language, then so would vast areas of law, including much of the U.S. Code.  *See, e.g.*, 7 U.S.C. § 228a ("Whenever the Secretary has reason to believe that any person subject to this chapter . . . ."); 15 U.S.C. § 56(b) ("Whenever the Commission has reason to believe that . . . ."); 18 U.S.C. § 2705(a)(1)(A) ("[I]f the court determines that there is reason to believe that . . . ."); 19 U.S.C. § 3571(b)(2) ("An interested party may request that the administering authority determine if there is reason to

believe that . . . ."); *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013) (when determining whether to grant section 10(j) injunctive relief the Second Circuit employs a two-pronged inquiry, "[f]irst, the court must find reasonable cause to believe that unfair labor practices have been committed[] . . ." (quoting *Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364–65 (2d Cir. 2001)).

In short, the Court concludes that the objective standard established here – "reason to believe that the participant has committed a violation of the Act or these Rules" – is sufficiently definite to guide the CFB's action. Accordingly, the Court finds no constitutional deficiency in the language of Rule 5-01(f)(1) and, thus, Defendants' motion to dismiss with respect to this provision is granted.

c. Catch-all Provisions

Finally, Plaintiffs submit that Rule 5-01(f) empowers the CFB with unbridled discretion since there are two catch-all provisions in the Rule, one in Rule 5-01(f)(7) and the other in the introduction to Rule 5-01(f). (Opp'n at 4, 9, 22.)

Rule 5-01(f)(7) allows the Board to find a candidate ineligible for public matching funds "if the participant or an agent of the participant has been found by the Board to have committed fraud in the course of Program participation *or to be in breach of certification pursuant to Rule 2-02*." CFB R. 5-01(f)(7) (emphasis added). The catch-all provision at issue is in Rule 2-02, which sets forth a non-exhaustive list of "fundamental breaches" of the written certification that candidates must submit to be eligible for public matching funds. CFB R. 2-02; (*see* Compl. ¶ 38). The catch-all

provision states in full that "[t]his rule is not intended to be an enumeration of all circumstances that may constitute a *fundamental breach* of obligations, as may be determined by the Board." CFB R. 2-02 (emphasis added).

In considering a plaintiff's facial challenge, the Second Circuit has instructed that:

> [w]hen evaluating a First Amendment challenge of this sort, we may examine not only the text of the ordinance, but also any binding judicial or administrative construction of it. And we are permitted – indeed, required – to consider the well-established practice of the authority enforcing the ordinance. All of these are essential as we try to make our way through the Scylla of regulations that are so tightly worded that the flexibility needed for administration is lacking, and the Charybdis of language so loose that, as a practical matter, courts become the licensing bureau.

*MacDonald v. Safir*, 206 F.3d 183, 191 (2d Cir. 2000) (citing *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). The Second Circuit has further noted that "[i]n the absence of state interpretation, federal courts 'will presume any narrowing construction or practice to which the law is fairly susceptible.'" *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 177 (2d Cir. 2006) (footnote omitted) (quoting *City of Lakewood*, 486 U.S. at 770 n.11 (citations and internal quotation marks omitted)).

In addressing whether the regulatory criteria is sufficiently imprecise, the Court notes that "perfect clarity and precise

guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Rather, the proper inquiry is whether the catch-all provisions are "'reasonably specific and objective, and do not leave the decision to the whim of the administrator.'" *Field Day*, 463 F.3d at 179 (quoting *Thomas*, 534 U.S. at 324).

With respect to the catch-all provision in Rule 2-02, referenced in Rule 5-01(f)(7), the Court finds that it is constrained by reasonably precise criteria. Indeed, the Second Circuit previously has upheld analogous catch-all provisions. *See Field Day*, 463 F.3d at 167; *diLeo v. Greenfield*, 541 F.2d 949, 954 (2d Cir. 1976) ("Some general 'catchall' phrase may be incorporated to ensure that the legislature's inability to detail all matters meant to be proscribed does not permit clearly improper conduct to go uncorrected."). In *Field Day*, the Second Circuit addressed the language of New York's Mass Gathering Law, which required that "[t]he plans, reports and specifications [of an application for a permit to promote or hold a mass gathering] shall provide for . . . *such other matters as may be appropriate for security of life or health*." 463 F.3d at 173 (emphasis added). The Second Circuit found that "[b]ecause we determine that the phrases 'health and safety' and 'life or health' are capable of guiding a permitting official's decision and rendering that decision subject to effective judicial review, we hold that the 'catch-all provisions' of the Mass Gathering Law and Sanitary Code are constitutional on their face." *Id.* at 178. Specifically, the Second Circuit upheld the clause because "it is possible to interpret the catch-all provision as providing . . . an objective standard," *id.* at 180, namely, that by "allowing a public official to condition the granting of a mass gathering permit on 'other matters as may be appropriate for security of life or health,'"

the provision "allows the official only to consider whether a proposed mass gathering presents *unreasonable* risks to life or health." *Id.* (emphasis in original).

The catch-all provision in Rule 2-02 is similarly constrained, as it limits the CFB's discretion by imposing a "fundamental breach" requirement for the narrow range of violations related to written certification. In addition to stating in the Rule's introduction that "[t]he Board considers each of the following activities to be a fundamental breach of the obligations affirmed and accepted by the participant or limited participant in the certification," Rule 2-02 restricts the five provisions preceding the catch-all clause to severe and intentional violations related to fraud. *See, e.g.*, CFB R. 2-02(a) ("submission of a disclosure statement which the participant *knew or should have known* includes *substantial fraudulent* matchable contribution claims" (emphases added)); CFB R. 2-02(b) ("use of public funds to make or reimburse *substantial campaign expenditures* which the *participant knew or should have known* were fraudulent" (emphases added)); CFB R. 2-02(c) (disguising authorized expenditures as independent expenditures); CFB R. 2-02(d) (concealing expenditures from the Board through a political committee; CFB R. 2-02(e) ("submission of *substantial information* which the participant or limited participant *knew or should have known was false*, or the submission of *substantial documentation* which the participant or limited participant *knew or should have known was fabricated or falsified*, which would avoid a finding of violation or public funds repayment determination (emphases added)). Put simply, this list of "fundamental breaches" concerns egregious violations involving fraud and, thus, does not provide the Board with unbridled discretion to find a "fundamental breach."

The Court concludes that the text of the Rule alone is sufficient to find that Rule 2-02's catch-all sufficiently limits the Board's discretion. In addition, to the extent that the Rule's legislative history (Ex. 7 to the Lebowitz Declaration) and the CFB's General Counsel's opinion in her October 9, 2007 memorandum (Ex. 4 to the Lebowitz Declaration) constitute a "binding administrative construction" or the CFB's "well-established practice," these materials bolster rather than undermine the Court's textual finding that Rule 2-02 does not afford the Board unbridled discretion.[5] *See MacDonald*, 206 F.3d at 191 (citing *Forsyth Cnty.*, 505 U.S. at 131) (stating that the Court must consider any "binding judicial or administrative construction" of the provision at issue and the "well-established practice" of the enforcing authority, when evaluating Plaintiffs' First Amendment challenge). Notably, the legislative history reveals that "the new rule reflects the Board's sense that such a severe consequence [finding the participant ineligible for public funds] should be applied only for *the most egregious violations*." (Ex. 7 to the Lebowitz Declaration at 5–6 (emphasis added).) Additionally, the General Counsel's October 9, 2007 memorandum states that "[t]he Board makes findings of breach of certification sparingly. Breach is reserved . . . for only *the most egregious violations* of the Program and the public trust." (Ex. 4 to the Lebowitz Declaration at 1 (emphasis added).) Thus, the catch-all provision in Rule 2-02 referenced in Rule 5-01(f)(7) is "'reasonably specific and objective, and do[es] not leave the decision to the whim of the administrator.'" *Field*

*Day*, 463 F.3d at 179 (quoting *Thomas*, 534 U.S. at 324). Accordingly, the Court grants Defendants' motion to dismiss with respect to the catch-all provision in Rule 2-02 referenced in Rule 5-01(f)(7).

However, a separate catch-all provision in the introduction to Rule 5-01(f) – which, incidentally, was not relied on by the Board in denying matching funds to the Liu campaign – affords the CFB far broader discretion. This provision provides that "[t]he Board shall determine whether public funds shall not be paid to a participant for reasons that *include, but are not limited to*" a list of ten non-exclusive reasons concerning violations of the CFA or the CFB's Rules and events that preclude eligibility, including "(1) if there is reason to believe that the participant has committed a violation of the Act or these Rules," and "(7) if the participant or an agent of the participant has been found by the Board to have committed fraud in the course of Program participation or to be in breach of certification pursuant to Rule 2-02 . . . ." CFB R. 5-01(f) (emphasis added). The Court finds that these six italicized words – and only these six italicized words – survive Defendants' motion to dismiss.

As an initial matter, Defendants' repeated assertions that the CFB does not interpret this provision broadly are of no moment at this stage of the proceedings. (*See, e.g.*, Reply at 6 ("[T]he CFB has always recognized that its power to declare a breach of certification, resulting in a finding of ineligibility for matching funds under Rule 2-02, is limited. The CFB interprets its power under 5-01(f) in the same light."); *id.* ("The CFB understands that it may find a campaign ineligible for matching funds . . . only for severe and egregious violations. The non-exclusive clause in the introduction to Rule 5-01(f) . . . is subject to the same limitation. The clause . . . is

---

[5] These attachments are properly before the Court in deciding Defendants' Rule 12(b)(6) motion since they are in Plaintiffs' possession, were relied upon by Plaintiffs in bringing suit, and all parties have notice of its contents. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002).

largely redundant and does not provide the CFB unbridled discretion to find a campaign ineligible."); *id.* at 1 ("The CFB has never possessed unbridled discretion to deny eligibility for matching funds, and Plaintiffs' argument to the contrary is constructed upon a studied disregard for the context of the phrase 'not limited to' in Rule 5-01(f). The challenged phrase, when read in context, merely authorizes the CFB to declare a campaign ineligible for committing severe violations of the . . . []CFA[], the CFB's Rules or other applicable campaign requirements."). Critically, Defendants' proffered interpretations are, at least at this stage of these proceedings, little more than unsupported assertions. Indeed, Defendants' position here resembles the stance of the city in Lakewood, in which

> [t]he city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice. This Court will not write nonbinding limits into a silent state statute.

*Lakewood*, 486 U.S. at 770 (citing *Freedman*, 380 U.S. at 85; *Poulos v. New Hampshire*, 345 U.S. 395 (1953); *Kunz v. New York*, 340 U.S. 290 (1951)). Thus, although Defendants' assurances here might well be true, they nevertheless fail to cite

any part of the Rule's text, any binding judicial or administrative construction of the Rule, and any well-established practice of the CFB that, for purposes of a Rule 12(b)(6) motion to dismiss, convinces the Court that the catch-all provision in Rule 5-01(f)'s introduction limits the CFB's power in any way. In this regard, the catch-all in Rule 5-01(f)'s introduction is very different from the catch-all provision in Rule 2-02.

Defendants' argument that the CFA permits Article 78 judicial review – New York's system for judicial review of administrative decisions – also is not enough for Defendants to prevail on a motion to dismiss. (Mem. at 17-18.) As the Supreme Court reasoned in *Lakewood*, "[t]he dissent is also comforted by the availability of judicial review. However, that review comes only after the mayor and the City Council have denied the permit. . . . Even if judicial review were relatively speedy, such review cannot substitute for concrete standards to guide the decision-maker's discretion." *Lakewood*, 486 U.S. at 771.

As the Supreme Court cautioned in *Thomas*, if a "licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323 (citing *Forsyth Cnty*., 505 U.S. at 131). Accordingly, the Supreme Court has required licensing regulations to include "concrete standards to guide the decision-maker's discretion." *Lakewood*, 486 U.S. at 771. Since the ordinance in *Thomas*, unlike Rule 5-01(f), did not have a catch-all provision, the Supreme Court determined that the licensing official could deny a permit "only for one or more of the reasons set forth in the ordinance." *Id.* at 324. Thus, unlike the ordinance in *Thomas*, Rule 5-01(f)'s catch-all provision is potentially unconstrained.

The catch-alls upheld by the Second Circuit in *Field Day* and *diLeo* are similarly distinguishable from the catch-all in Rule 5-01(f)'s introduction.   In *Field Day*, as discussed above, the Second Circuit found that "it is possible to interpret the catch-all provision as providing . . . an objective standard."   *Field Day*, 463 F.3d at 180. Unlike the limitless "include, but are not limited to*"* language in Rule 5-01(f), the catch-all held to be constitutional in *Field Day* was cabined by "reasonably specific and objective" criteria, including an appropriateness requirement.  *Id.* at 181.

With respect to the catch-all provision upheld in *diLeo* – which turned on the agency's proving "other due and sufficient cause," *diLeo*, 541 F.2d at 951 – that clause was saved, at least in part, by the doctrine of *ejusdem generis*, which is inapplicable to the catch-all language here.   The Second Circuit has explained that the *ejusdem generis* interpretive principle stands for the proposition that "general terms that *follow* specific ones are interpreted to embrace only objects of the same kind or class as the specific ones."   *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008) (emphasis added).   This doctrine had force in *diLeo* because the catch-all there *followed* a list of specific terms.   But *ejusdem generis* has no application here, since the Rule 5-01(f) non-limiting phrase – "[t]he Board shall determine whether public funds shall not be paid to a participant for reasons that *include, but are not limited to*" – introduces, rather than follows, the more specific list of reasons.   In fact, the non-limiting phrase makes plain that the enumerated items that follow are *not* intended to limit the provision's scope.   Indeed, it is hard to imagine what purpose the words "but are not limited to" could serve other than to specifically foreclose the argument that the subsequent list limits the scope of the catch-all.

To be sure, in 2001, a similarly-structured non-exhaustive list of "extraordinary circumstances" included in the CFA was found to be constitutional. *Ostrom*, 160 F. Supp. 2d at 496–97. However, even if *Ostrom* were binding upon this Court – which it is not – it is distinguishable.   First, the opinion resolved cross motions for summary judgment – not, as here, a motion to dismiss where the Court does not have the benefit of further evidence from both sides regarding the CFB's practices and guidelines associated with Rule 5-01(f)'s introduction.   Second, and more importantly, the *Ostrom* catch-all was significantly constrained because it applied only to "extraordinary circumstances," whereas the Rule 5-01(f) catch-all includes no such textual limitation.

Finally, the presence of the Rule 2-02 catch-all – at least based on the information before the Court at the motion to dismiss stage – undermines Defendants' interpretation that the Rule 5-01(f) catch-all pertains only to "severe and egregious violations" (Reply at 6), since the Rule 2-02 catch-all *already* addresses miscellaneous "egregious violations" and "severe abuses" (*id.* at 5), as corroborated by the Rule's language, legislative history, and interpretation by the CFB's general counsel (*id.* at 5-6).   Interpreting the Rule 5-01(f) catch-all as only pertaining to "severe and egregious violations" (*id.* at 6) would thus make Rule 5-01(f)'s introduction largely redundant.

Accordingly, the Court finds that the catch-all provision in Rule 5-01(f) – which empowers the Board to deny a participant public matching funds "for reasons that include, but are not limited to" the enumerated violations – survives Defendants' motion to dismiss.

18

Despite allowing Plaintiffs' overbreadth challenge to continue, the Court remains mindful of the well-established precedent placing a heavy burden on Plaintiffs going forward. Specifically, the Supreme Court has warned that "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects," and therefore, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008) (emphasis in original) (citing *Fox*, 492 U.S. at 485; *Broadrick*, 413 U.S. at 615). Furthermore, "[t]he 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Id.* at 303 (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Rather, for Plaintiffs to ultimately prevail, they "must demonstrate from the text of [the Rule] *and from actual fact* that a substantial number of instances exist in which the [Rule] cannot be applied constitutionally." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (emphasis added). Thus, with respect to the ultimate merits of the limited portion of Plaintiffs' First Amendment claim that survives, the Court finds instructive the following modified language from *MacDonald*:

> Our conclusion that the ordinance is not sufficiently precise on its face to pass constitutional muster does not, however, mean that [Plaintiffs] win[]. It only means that [granting Defendants' motion to dismiss in full would be] premature. The[re] . . . [must be] submission of further evidence – by both sides – regarding the [CFB's] practices and guidelines associated with . . . [Rule

5-01(f)'s catch-all]. . . . [O]n the record before us, we simply cannot know at this time the proper result.

*MacDonald*, 206 F.3d at 193.

## IV. PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM

Plaintiffs also allege that they have been "singled out for . . . adverse treatment," as "[c]andidates and campaigns in circumstances similar to Plaintiffs' were treated more favorably by Defendants than Plaintiffs were, for reasons lacking any reasonable nexus with a legitimate government policy." (Compl. ¶¶ 212–213.) Plaintiffs allege that such conduct violates the Fourteenth Amendment's Equal Protection Clause, under the "class of one" theory. (*See id.* ¶¶ 209–216; Opp'n at 23–25.) Specifically, Plaintiffs describe the CFB's handling of six other campaigns, all of which sought public matching funds during their respective elections. (*See* Compl. ¶¶ 58–93.) The Court summarizes below the alleged facts relating to each of these six campaigns and finds that, because Plaintiffs fail to allege that the comparators were sufficiently similar to Plaintiffs, they have failed to state a "class of one" equal protection claim.

### A. The CFB and the Six Other Campaigns

#### 1. Pedro Espada, Jr.

Pedro Espada, Jr., ran for Bronx Borough President in 2001 and requested $173,000 in public funding from the CFB. (*See id.* ¶ 78.) After performing a preliminary audit of the Espada campaign, the CFB voted to deny public funding on August 16, 2001. (*See id.* ¶¶ 78–79.) Among other reasons, the CFB stated that it was "suspicious of certain contributions made by employees" of a non-profit

organization "controlled" by Espada and was troubled by an undisclosed newsletter that appeared to be campaign literature for the Espada campaign. (*Id*. ¶ 79.) On August 30, 2001, the CFB issued a final ruling that denied public funds to the Espada campaign, citing CFB Rule 5-01(f) and stating that "there is reason to believe that the [Espada campaign] has committed violations of the [CFA]." (*Id*. ¶ 80.) The Complaint does not allege that Espada or his associates ever were charged with or convicted of criminal violations relating to the campaign. (*See id*. ¶¶ 78–87.)

### 2. Fred Masson

In 2009, Fred Masson ran in the Democratic primary for a City Council seat in Manhattan. (*See id*. ¶ 88.) After finding irregularities with some matchable contribution reports and discussing them with Masson's campaign, the CFB found that it lacked "sufficient assurance that the [c]ampaign's reported contributors did, in fact, contribute to the [c]ampaign or that they contributed in the amounts reported to the Board." (*See id*. ¶¶ 89–91.) Accordingly, the CFB denied public funding to Masson. (*See id*. ¶ 92.) The Complaint does not allege that Masson or his associates ever were charged with or convicted of criminal violations relating to the campaign. (*See id*. ¶¶ 88–92.)

### 3. Elizabeth Crowley

In 2001, Elizabeth Crowley ran for a City Council seat in Queens. (*See id*. ¶ 63.) Although Crowley "failed to respond completely and adequately to allegations of fraud and misrepresentation in connection with the submission of two sets of money order contributions" (*id*.), Crowley nevertheless received more than $145,000 in public funding, which was "disbursed *after* the CFB had already alleged wrongdoing by

the campaign" (*id*. ¶ 66 (emphasis in original)). Following the election, the CFB issued a $20,000 fine to the campaign for various violations, including "exceeding expenditure limits," "exceed[ing] contributions limits," and "failing to provide required information about intermediaries." (*Id*. ¶ 65.) The Complaint does not allege that Crowley or her associates ever were charged with or convicted of criminal violations relating to the campaign. (*See id*. ¶¶ 63–67.)

### 4. Danny King

In 2005, Danny King ran in the Democratic primary for a City Council seat in Brooklyn. (*See id*. ¶ 72.) The CFB identified "suspicious" matchable contribution reports and issued a notice of alleged violations. (*See id*.) At a meeting where the CFB discussed whether the King campaign violated the CFA, the CFB decided to defer consideration of the issue. (*See id*. ¶¶ 72–73.) The King campaign received $39,623 in public matching funds, which the campaign was required to pay back when the CFB issued its final audit in 2008. (*See id*. ¶ 74.) The Complaint does not allege that the CFB voted to grant King access to public funds after discovering the questionable reports. (*See id*. ¶¶ 72–77.) The Complaint also does not allege that King or his associates ever were charged with or convicted of criminal violations relating to the campaign. (*See id*.)

### 5. Kendall Stewart

In 2001, Kendall Stewart ran for a City Council seat in Brooklyn. (*See id*. ¶ 68.) Although the CFB found that Stewart's campaign "lied to the [CFB] regarding a suspicious contribution from a business" whose chairman or CEO was the candidate (*id*. ¶¶ 68–69), Stewart nevertheless received more than $75,000 in public funding (*id*. ¶

71). The Complaint does not allege that the CFB granted Stewart access to public funding after discovering the lie (*see id.* ¶¶ 68–71), nor does the Complaint allege that Stewart or his associates ever were charged with or convicted of criminal violations relating to the campaign (*see id.*).

### 6. Sheldon Leffler

In 2001, Sheldon Leffler ran in the Democratic primary for Queens Borough President. (*See id.* ¶ 58.) After the CFB found discrepancies in Leffler's contribution records, it invalidated the matchable contribution reports related to those discrepancies. (*See id.*) The CFB nevertheless allowed Leffler to continue participating in the matching funds program, and even after the discrepancies were found, allowed Leffler's campaign to receive $296,084 in public funding. (*Id.*) Unlike the other five comparators, in 2003, two years after the elections, a jury convicted Leffler of "conspiracy, attempted grand larceny, three counts of offering a false instrument for filing, furnishing false evidence, and attempted defrauding of the government." (Compl. ¶ 59.) Leffler's campaign treasurer and another staff member were "also convicted on related charges." (*Id.*) In 2004, the CFB fined the Leffler campaign $89,500. (*See id.* ¶ 62.)

### B. Discussion

The Fourteenth Amendment provides: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "It is well settled that the Equal Protection Clause protects persons, not groups, and that the Clause's protections apply to administrative as well as legislative acts." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597 (2008) (alteration, citations, and internal quotation

marks omitted). To bring a "class of one" claim, Plaintiffs must "allege[] that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Specifically, class-of-one plaintiffs must first allege that "*no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy*," and, second, that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.)).

Of course, the Court is mindful that "[g]enerally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside*, 468 F.3d at 159. However, a plaintiff cannot automatically sidestep a motion to dismiss merely by virtue of having pleaded a claim that turns, in part, on the similarity of comparators. *See, e.g.*, *Ruston*, 610 F.3d at 60 (affirming a grant of a motion to dismiss because none of the seven identified comparators were "sufficiently similar" to plaintiffs); *Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 592 (S.D.N.Y. 2014) (granting a motion to dismiss after finding that plaintiff had provided "an insufficient basis from which to infer that the [two comparators] were sufficiently similar to [plaintiff] to state a 'class of one' claim"). Thus, the Court rejects Plaintiffs' suggestion that "[o]nly at the *summary judgment* phase" may the Court consider whether parties are similarly situated. (Opp'n at 24 (emphasis in original).) In fact, the Court is obligated to

grant a motion to dismiss when, as here, the comparators' positions significantly differ from Plaintiffs' on the face of the pleadings.

With respect to the "sufficient similarity" requirement, the Second Circuit has explained that "[t]he purpose of requiring sufficient similarity is to make sure that no legitimate factor could explain the disparate treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). The similarity requirement is demanding – "[c]lass-of-one plaintiffs must show an *extremely high degree of similarity* between themselves and the persons to whom they compare themselves." *Ruston*, 610 F.3d. at 59 (emphasis added) (citing *Clubside*, 468 F.3d at 159); *see also Clubside*, 468 F.3d at 159 ("[T]he existence of persons in similar circumstances who received more favorable treatment than the plaintiff in a class-of-one case is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." (citation and internal quotation marks omitted)); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) ("[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical." (citation and internal quotation marks omitted)), *rev'd on other grounds sub nom. Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008).

Given this stringent requirement, the Court has little difficulty concluding that none of the six comparators cited by Plaintiffs is sufficiently similar to support a "class of one" claim. As an initial matter, comparators Espada and Masson – like Plaintiffs – were *denied* matching funds. (*See* Compl. ¶¶ 78–92.) Since class-of-one plaintiffs must allege that they were

"intentionally treated *differently* from others similarly situated," *Olech*, 528 U.S. at 564 (emphasis added), the Complaint's references to the Espada and Masson campaigns are not facts alleging "differential treatment," *Ruston*, 610 F.3d. at 60 (citing *Clubside*, 468 F.3d at 159), and therefore undermine their class-of-one claim.

With respect to comparators Crowley, King, Leffler, and Stewart – all of whom at least received some matching funds – Plaintiffs do not plead facts showing that the CFB provided the funds *after* campaign officials were convicted for wrongdoing related to the campaigns. (*See* Compl. ¶¶ 58–77.) Indeed, in each instance, the Complaint properly notes that there had not even been an *indictment* at the time the CFB found the comparator campaigns eligible for matching funds. (*See id.*)

To be sure, Leffler presents a closer case than the others, since Leffler, his campaign committee, his treasurer, and another staffer were *subsequently* indicted and convicted of wrongdoing related to the campaign. (*See id.* ¶ 59.) But the timing of Leffler's indictment and conviction is crucial; these events did not occur until 2013, long *after* the CFB disbursed matching funds to Leffler's campaign on August 6, 2001. (*Id.* ¶¶ 58–59.) Thus, when the CFB found the comparator campaigns eligible for matching funds, these campaigns were, at most, merely *suspected* of campaign infractions, whereas Liu's former campaign treasurer and a fundraiser had already been indicted (February 2012) and convicted (May 2013) *prior to* the CFB's eligibility determination in August 2003. (*Id.* ¶¶ 103, 122, 169–171.) The fact of indictment, the availability of evidence uncovered both before and during the trial, and the fact of conviction, are all significant differences between the Liu and Leffler campaigns.

Put simply, Plaintiffs and their six comparators are far from being "*prima facie* identical," *Neilson*, 409 F.3d at 105, and they do not display "an extremely high degree of similarity," *Ruston*, 610 F.3d. at 59 (citing *Clubside*, 468 F.3d at 159). Rather, Plaintiffs are in a materially different position than their comparators, and the Court finds that these differences provide a rational basis for the difference in treatment. *See Olech*, 528 U.S. at 564. Therefore, it cannot be said that "*no rational person* could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Ruston*, 610 F.3d at 60 (emphasis added) (citing *Clubside*, 468 F.3d at 159). Accordingly, the Court dismisses Plaintiffs' equal protection claim with prejudice.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is denied with respect to Plaintiffs' First Amendment facial challenge to the catch-all provision in Rule 5-01(f)'s introduction, but granted in all other respects. Accordingly, the Clerk of the Court is respectfully directed to terminate the motion pending at docket entry 27.

The Court reiterates that its somewhat technical holding – which allows part of Plaintiffs' First Amendment challenge to survive – is limited only to six words of Rule 5-01(f), and these six words have nothing to do with the Board's decision to deny matching funds to the Liu campaign in 2013. As noted above, the Court has little difficulty concluding that Plaintiffs have failed to plead facts in support of a plausible "as-applied" First or Fourteenth Amendment claim based on the CFB's withholding of matching funds. Thus, Plaintiffs' sole

remaining First Amendment claim is not a referendum on whether the CFB's denial of matching funds to Liu's campaign in 2013 was justified. Rather, Plaintiffs' lone surviving claim concerns the prospective application of Rule 5-01(f) and whether six words of that provision vest too much discretion in a government body empowered to disburse or deny funds to candidates seeking elective office. As noted above, Plaintiffs' burden in this regard will be considerable, as they must ultimately demonstrate that Rule 5-01(f)'s overbreadth is "substantial." *See Williams*, 553 U.S. at 292. Nevertheless, at this early stage of the proceedings, Plaintiffs' facial challenge to the Rule survives – at least for the time being.

In light of this Opinion and Order, the parties are directed to submit a revised joint letter and scheduling order by April 10, 2015, which shall follow the same format as docket entries 20 and 20-1.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 31, 2015
New York, New York

\*      \*      \*

Plaintiffs are represented by Richard D. Emery, Alison Frick, and David A. Lebowitz of Emery Celli Brinckerhoff & Abady LLP, 600 Fifth Avenue, 10th Floor, New York, New York 10020.

Defendants are represented by Thomas B. Roberts, Assistant Corporation Counsel, for Zachary W. Carter, Corporation Counsel of the City of New York, 100 Church Street, Room 2-110, New York, New York 10007.